NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0149n.06
Filed: February 24, 2005

No. 03-3090

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| MIRI BIBASHANI, DIANA BIBASHANI, AND XHONIS BIBASHANI, | ) ) ) | |
| Petitioners-Appellants, | ) | ON PETITION FOR REVIEW OF AN ORDER OF THE BOARD OF IMMIGRATION APPEALS |
| v. | ) ) ) | |
| JOHN ASHCROFT, Attorney General of the United States, | ) ) | OPINION |
| Respondent-Appellee. | ) ) ) | |

BEFORE:     NELSON and COLE, Circuit Judges; SARGUS, District Judge.[*]

**R. GUY COLE, JR., Circuit Judge.**  Petitioners Miri Bibashani, Diana Bibashani, and

Xhonis Bibashani appeal a decision of the Board of Immigration Appeals ("BIA") affirming an

Immigration Judge's denial of petitioners' asylum and withholding-of-removal claims under 8

U.S.C. § 1158(a).  For the reasons that follow, we **GRANT** the petition for review, **REVERSE** the

decision of the BIA, and **REMAND** for proceedings consistent with this opinion.

## I.  BACKGROUND

Petitioners Miri Bibashani, his wife Diana, and his son Xhonis are natives and citizens of

Albania.  Miri Bibashani is the principal asylum applicant, and his wife and child are derivative

---

[*]The Honorable Edmund A. Sargus, United States District Judge for the Southern District of Ohio, sitting by designation.

beneficiaries of the asylum request. *See* 8 U.S.C. § 1158(b)(3); 8 C.F.R. § 208.21 (2002). "Petitioner" and "Bibashani" will refer to Miri Bibashani hereinafter.

On June 22, 1999, Bibashani entered the United States through Chicago's O'Hare International Airport. He informed the immigration officer that he came to the United States because his family had been persecuted by the Communist regime in Albania. The persecution occurred, he stated, both while the Communist regime was in power prior to 1992 and when the Socialists came into power in 1997.

In a letter accompanying his petition for asylum, Bibashani described several events to support his request. Bibashani claims he was arrested and severely beaten by officials affiliated with the Communist government in April 1990. Then, he claims that on June 16, 1990, he was beaten until he was almost unconscious after participating in political demonstrations. After these occurrences, Bibashani and his family became members of the Anti-Communist Democratic Association and the Association of the Politically Persecuted. Bibashani submitted documents to support this membership at his removal hearing.

In addition, Bibashani stated in his letter that on June 29, 1997, he was threatened by two members of the Socialist Party voting commission after he represented the Democratic Party at a voting center where he claims he witnessed voter fraud carried out by two commission members, Nikoll Dardha and Met Ulquinaqu. Bibashani alleges Dardha threatened him and put a gun to his head. Bibashani claims that members of the Democratic Party began to disappear following the election. Other members were ordered to appear at prosecutors' offices.

Bibashani's letter also stated that he spoke at a demonstration on July 15, 1997 about the

voter fraud he witnessed on the election day. After the demonstration, Bibashani claims, he and his wife were followed home and beaten. The individuals told them they would have to leave the city or they would "get rid of me." Following this incident, Bibashani's wife received threats at work and consequently decided to quit her job.

Bibashani claims that between February and July 1998, he was threatened, taken to the police department, detained, and beaten. On September 14 of that year, he was detained for three days and beaten. The police charged Bibashani, he claims, with attempting to overthrow the Socialist government. He claims that the investigation surrounding this charge is ongoing.

Finally, Bibashani claims that in April 1999, the police dragged him from a friend's bar to the police station and pressured him to cooperate with them in exchange for benefits. They also told him that failure to cooperate would result in harm. After promising to cooperate, Bibashani was released. He took his wife and son to a nearby village where he remained in hiding for a month. It was at this time that he left Albania and came to the United States. He claims that the Albanian police are still looking for him.

In addition to his own experiences, Bibashani described the experiences of his friends and relatives. He claimed that in July 1999, one of his friends was killed by border crossing guards. He also stated that his brother Zef was arrested and sentenced to eight years in prison in Albania.[1]

At his removal hearing, Bibashani testified about the events described in his letter. His testimony was largely consistent with the letter he submitted with his petition for asylum. In

---

[1]Bibashani asserted that his brother was granted asylum in the United States.

addition, he testified that his mother, who still lives in Albania, receives threats and harassment regarding his current whereabouts. He also testified that he funded his travel to the United States by selling his mother's house, receiving the proceeds of the sale from his brothers in the United States, and two machines from his business.

C'est Bibashani, the Petitioner's brother, was the only other witness called at the hearing. C'est testified that in 1997 the Petitioner told him about the incident involving the voting center and the threat made against him by putting a gun to his head. He also testified that a few months later the Petitioner told him about the threats made to both him and his wife on their way home from the demonstration and the arrest while having coffee in his friend's bar. In addition, C'est testified that he spoke to his brother in 1998 and learned that he continued to have problems. He also testified that he later spoke to his brother about arrangements for his trip to the United States.

The Immigration Judge denied Bibashani's request for asylum and withholding of removal. The BIA affirmed. This appeal followed.

## II. ANALYSIS

### A. Standard of Review

This Court may reverse the BIA's factual determinations only where the evidence compels a contrary conclusion. *See Klawitter v. INS*, 970 F.2d 149, 152 (6th Cir. 1992). This Court reviews the BIA's legal conclusions *de novo*. *See Adhiyappa v. INS*, 58 F.3d 261, 265 (6th Cir. 1995).

### B. Applicable Law

An applicant for asylum has the burden of demonstrating with clear probability that he is a refugee, meaning that he cannot return to his country of origin because he suffered past persecution

and has a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. *See* 8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 208.13(a); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436 (1987). If past persecution is established, a rebuttable presumption arises that the applicant has a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1) (2002). Once the burden of proof shifts to the Department of Homeland Security, the Department may rebut this presumption with a showing by a preponderance of the evidence that there has been a fundamental change in circumstances such that the petitioner no longer has a well-founded fear of persecution. 8 C.F.R. § 208.13(b)(1)(ii).

An applicant may also show a well-founded fear of future persecution if he shows a reasonable possibility of actually suffering such persecution if returned to the country in question. 8 C.F.R. § 208.13(b)(2)(i)(B). In order to make this showing, the applicant must demonstrate that a reasonable person in his or her circumstances would fear persecution. *See Cardoza-Fonseca*, 480 U.S. at 439. The applicant may also meet this burden if he shows a practice of persecution of similarly situated persons in that country. 8 C.F.R. § 208.13(b)(2)(iii).

"An adverse credibility finding must be based on issues that go to the heart of the applicant's claim." *Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004). Findings of non-credibility cannot be based upon irrelevant inconsistencies in the evidence presented to an Immigration Judge. *Daneshvar v. Ashcroft*, 355 F.3d 615, 619 n.2 (6th Cir. 2004). If presented discrepancies cannot be viewed as attempts by the applicant to enhance his claim of persecution, they have no bearing on credibility. *Id.* at 623 (citation and quotation omitted).

**C. Discussion**

The BIA, without deciding whether the Petitioner was credible, found that he did not meet his burden of establishing that he suffered past persecution or that he had a well-founded fear of future persecution on account of his political opinions. The Board set forth three reasons for this determination: a) Petitioner's problems under the post-Communist regime in Albania were not necessarily a continuation of his problems under the Communist regime; b) Petitioner's problems with Socialist Party members and country conditions do not support a finding that he was targeted for persecution on account of his political opinion; and c) the testimony of C'est Bibashani did not corroborate Petitioner's account.

First, the Board stated that Petitioner cannot make a connection between the problems he had under the Communist regime and his problems under the post-Communist regime. It found that such a claim could not be based solely on the fact that the Socialist Party members in office today are the same as former Communist party government officers. However, a connection between Petitioner's problems under the Communist regime and his problems under the post-Communist regime is not necessary to Petitioner's claim of persecution. Even if the Court disregards Petitioner's family's history of persecution by the Communist regime and Petitioner's beatings in 1990 as a result of his involvement in anti-Communist demonstrations, Petitioner has met his burden of showing that he was threatened because of his political views under the post-Communist regime. In June 1997, Petitioner represented the Democratic Party and attempted to speak out against election frauds allegedly attempted by two members of the opposing Socialist Party. Petitioner was threatened at gunpoint and forced to leave the voting center. A few weeks later, when Petitioner spoke out about the incident at a public meeting, he and his wife were stopped on their way home and beaten.

Bibashani was told he should leave the city or else they would "great rid" of him. His wife received threats at work and subsequently quit her job. In addition, Bibashani was threatened, detained, and beaten by police officers twice in 1998 and once in 1999. In light of the persecution evidence under the post-Communist regime alone, a reasonable factfinder could only conclude that this evidence supports Petitioner's claim of persecution under the post-Communist regime.

Second, the BIA stated that Petitioner's problems with the Socialist Party do not demonstrate that he has been targeted for persecution by the government on account of his political opinion. The Board notes that the Department of State Bureau of Democracy, Human Rights, and Labor's *Profile of Asylum Claims and Country Conditions* ("*Profile*") describes "social disorder and near anarchy" in Albania that allows those in political power to carry out personal vendettas. The BIA opinion expressly cites, "Democratic Party members were indeed the victims of numerous attacks and murders, but in Albania's general atmosphere of lawlessness and lax law enforcement, neither culprits nor motives were ever found or confirmed for most of these crimes." As a result, the Board concluded Petitioner cannot support his claim that he was persecuted on account of his political opinion based on the country conditions in Albania.

Regardless of the general atmosphere in Albania, Petitioner in this case supported his claim that he was specifically targeted for persecution on account of his political beliefs. Petitioner described his representation of the Democratic Party at a voting center and the subsequent threats and attacks resulting from this representation. At the voting center, Petitioner witnessed voter fraud carried out by members of the Socialist Party. These members threatened Petitioner and put a gun to his head. Several weeks later, after a demonstration wherein Petitioner described the voter fraud

he witnessed, several men followed him and his wife home and beat them. They instructed Bibashani to leave the city or face dire consequences.

These threats and physical assaults were tied explicitly to Bibashani's representation of the Democratic Party. They compel a finding that Bibashani was targeted on account of his political opinion.

Finally, the BIA concluded that Petitioner's testimony was not corroborated by his brother C'est. However, the inconsistencies between Petitioner's testimony and his brother's testimony were minor and irrelevant. The Board points out that C'est testified that he heard about the incident at the bar in 1997. This contradicts Petitioner's testimony that the event occurred in 1999. The Board also points out that C'est testified that he learned about the incident through both Petitioner and his father while Petitioner testified that his father had died in 1973. These minor and irrelevant inconsistencies, however, are insufficient to support the BIA's finding that C'est's story did not corroborate Petitioner's story. *Cf. Daneshvar*, 355 F.3d at 622 n. 2. One or two mis-statements as to exact dates or sources would not lead a reasonable fact finder to conclude that Petitioner failed altogether to establish past persecution.

The BIA also found an inconsistency where C'est testified that Petitioner had informed him that Petitioner had made arrangements for departure from Albania with a smuggler who would sell Petitioner's house and that C'est would provide for the remaining monies necessary for the trip. The BIA determined that this contradicted Petitioner's testimony that he sold two machines from his business, used proceeds from the sale of his mother's house, and used monies sent to him from his brothers in the United States to pay for his departure. Further, how the Petitioner obtained funds to

travel to the United States is of little significance to his claim of persecution. Therefore, any minor inconsistencies regarding how Petitioner obtained money to flee Albania do not support an adverse finding as to persecution. *Cf. Daneshvar*, 355 F.3d at 623.

Viewing the record as a whole, the evidence compels a finding contrary to the BIA's conclusion that, assuming Petitioner's credibility, he failed to meet his burden in establishing past persecution. On remand, if the BIA finds Petitioner credible, it must proceed to analyze whether the government has rebutted the presumption of a fear of future persecution.

### III.  CONCLUSION

For the reasons stated above, we **GRANT** the petition for review, **REVERSE** the decision of the BIA, and **REMAND** for proceedings consistent with this opinion.